## INSUFFICIENT SHOWINC TO DEFEAT A WILL.

### Circuit Court of Licking County.

### FRANK WILSON ET AL V. JOSERH B. WILSON.

### Decided, March Term, 1909.

*Wills—Want of Mental Capacity Not Shown, When—Testimony in Favor of Contestants Without Value, Where Based on Ideas of the Witnesses as to the Kind of a Will the Testator Should Have Made.*

Want of mental capacity on the part of a testator is not shown by a recital of circumstances and incidents which go no further than to indicate some physical weakness, or failure of memory, or mistake of an unimportant character in connection with his business affairs; nor can an attack on a will be successfully maintained where the witnesses for the contestants seem to have reached the belief that the testator was incompetent to make a will because he did not make the kind of a will which they would have made or which they thought he ought to have made.

*A. A. Stasel* and *Flory & Flory,* for plaintiff in error.
*Kibler & Montgomery,* contra.       .

VOORHEES, J.; TAGGART, J., and DONAHUE, J., concur.

The will of James P. Wilson, the validity of which is the question in controversy in this action, and under review in these proceedings in error, was made on the 5th day of January, 1900, at his office or place of business at the village of Granville, in the county of Licking, Ohio. The testator died June 7, 1906, being then of the age of about seventy-six years. At the time the will was executed, he was about seventy years old. He died leaving Susan Wilson, his widow, and three children, two sons and a daughter, namely: Joseph B. Wilson, Frank Wilson and Mary Wilson.

The said Joseph B. Wilson contests the will on two grounds, namely:

1st. That by reason of age, disease and other causes, said James P. Wilson was incompetent mentally to do or understand ordinary business transactions, or to understand or appreciate

what he was doing when he signed said will; that he was then of unsound mind and memory; that he had not sufficient mental capacity to know or understand the extent of his estate and the persons who would naturally be the objects of his bounty.

2d.   That said will was procured to be made and executed by the defendant, Frank Wilson, by persuasion and undue influence exercised by him at and before the time of the making of said will, over and upon the mind and will of said James P. Wilson, by which said James P. Wilson, against his will, was wrongfully induced to favor said Frank Wilson and his children, namely: James Perry Wilson and Eva Wilson (who are made defendants in said action), in the disposition of testator's property; that testator's mind, without any just cause or reason, became set against said contestant, Joseph B. Wilson, causing testator to discriminate against him in making said will.

After the death of said James P. Wilson, said will was admitted to probate and record by the probate court of said Licking county.

The testator by the will in question gives all his property, real and personal, wherever located, to his wife, Susan Wilson, during her natural life.   At the death of his wife, he devises and bequeaths to his son, Joseph B. Wilson, the farm on which he, Joseph, then lived, containing 111 acres, more or less.   If the said Joseph should die without issue of his body then at his death said farm of 111 acres goes back to his, testator's, legal heirs.

To his daughter, Mary Wilson, he gives his farm situated in Crawford county, Ohio, containing seventy-seven acres, more or less; also the old Water Cure house and lot 120 and lot 128 situated in the village of Granville, Licking county, Ohio; also all his household goods.

To his son, Frank Wilson, he gives what he designates his home place of fifteen acres, lying just south of Raccoon creek in Granville township, Licking county, Ohio; also the three lots in the village of Granville, with the appurtenances thereto belonging; also to his son Frank, the Eggleston farm, containing 126 acres, more or less, said farm lying along the Alexandria road in said county.

To his grandson, James ·Perry Wilson, he gives $1,000; and to his grand-daughter, Eva Wilson, he gives the property known as the Aiken property, situated in the village of Granville. If any property should be left after paying the demises provided for, the balance to be divided equally betwen his said daughter, Mary, and his son, Frank.

He named his daughter Mary and his son Frank executors, without bond.

The testator had made a prior will in the year 1898 or 1899. written by J. C. Malone (who was a witness for the contestant 'in this trial), and through or by the disclosure by this witness of the contents of said will written by him, to some of the family, among them, to the contestant Joseph, the old gentleman afterwards, and in about a year or less from the making of said will, made the will in question securing the services of a different scrivener to write the second or last will. Just what the provisions of the first will were, or wherein it differed, if at all, from the last will, is not disclosed by the record in this case.

The testator at the time the will in question was made, owned an estate, real and personal, estimated in amount in the neighborhood of $50,000. He had been a thrifty man in the accumulation of property. He was an uneducated man; in the language of some of the witnesses "a self-made man," and a shrewed dealer in business matters. He was able to make money at times when others were feeling the effects of general depression and dullness in business affairs. He continued to carry on his business (that of a lumber dealer) 'some four or five years after the making of the will in question, being assisted at times in some of the office work, in the way of keeping his accounts, by his daughter Mary, and his son Frank was in some way connected with the lumber business with his father, but as a general thing the business was managed by the old gentleman himself.

The facts bearing upon the want of testamentary capacity offered by witnesses in behalf of the contestant, namely Richards, Partridge, Jones, Agey, Malone, Jos. B. Wilson and Scott Ramey, show an inherent weakness in their testimony in the facts and circumstances related and detailed by them, upon

which their opinion is based, as to the want of mental capacity of the testator to transact ordinary business. Without undertaking to give in detail the facts, incidents and circumstances related by these several witnesses upon which their opinions are based, it will be sufficient to state that the circumstances and incidents tend to show some physical weakness, failure of memory, and slight mistakes made by the testator in connection with his business affairs, but when tested by reason and the experience of mankind, these circumstances and incidents are such that may occur with persons where there would be no question of their ability to transact ordinary business. Take, for example, the incident where the old gentleman on one occasion had lost his pocketbook, and spent some hours in hunting for it. It was lost in the office. Just how it was lost or what he was doing with his pocketbook when it was misplaced is not disclosed, but it seems that this incident is greatly magnified by the witnesses in giving an account of it.

Take the incident mentioned by Mr. Jones, where he had settled a business matter with the old gentleman, whereby a note was given by Mr. Jones to Mr. Wilson. After the note was executed, the old gentleman requested Mr. Jones to keep it in his, Jones' safe. It seems that the old gentleman had no safe at his place of business at the lumber yard. If this circumstance or incident has any significance at all, it is simply this, showing the great confidence that Mr. Wilson had in Mr. Jones, a man with whom he had had numerous dealings. He seems to have had more confidence in the honesty of Mr. Jones than Mr. Jones had himself, because Mr. Jones gives this as an incident or circumstance, in his judgment, showing want of business capacity in Mr. Wilson.

Mr. Richards, the scrivener who wrote the will, gives as the reasons why, in his judgment, the old gentleman was incompetent to do business, that when he (Richards) called at the office at the lumber yard on the morning to write the will, he was there some fifteen minutes and nothing was said by the old gentleman as to the business that he wished Richards to transact. Finally, Richards said to the old gentleman that "Frank (meaning the son of the testator) came to my house and re-

quested me to come down and write your (Mr. Wilson's) will'';
to which the old gentleman answered: ''I suppose I will have
to.'' The witness then said to him: ''You don't have to do
anything of the kind,'' and the old gentleman then said: ''Well.
write it''; and witness sat down and wrote the will. The witness
testifies that the items and terms of the will were given and
dictated to him by the old gentleman; that they were at the
office alone; Frank, the son, coming into the office once or twice
while the will was being prepared. He said nothing the first
time he came in, but the second time he mentioned the Eggles-
ton farm, but what he said about the Eggleston farm witness
does not remember. After the will was finished and the witness
and Frank were going out of the office up street, Frank said
that ''Joe's wife ought not to have that property after his
death,'' that is, the property on which Joseph resided. The
testimony of this witness seems to be very indefinite in many of
the details as to the transactions that occurred at the time the
will was written; and in the cross-examination his capricious
answers to many of the questions tend largely to weaken his
testimony.

When you examine the testimony of the witnesses for the con-
testant, who have given opinions as to the mental capacity of
Mr. Wilson to transact business, it seems to be influenced very
largely by their notions as to what kind of a will Mr. Wilson
should have made. In other words, because he did not make
such a will as they would have made or thought he should make
they were led to believe that he was mentally incompetent to
transact business. Taking the will itself, its terms and condi-
tions, dictated, as the scrivener says it was, by Mr. Wilson him-
self without suggestions from him or any one, or the items given,
there is nothing inherent in the will or language used that tends
in any way to show a want of comprehension of the business in
which he was engaged, the extent of his property, or the objects
of his bounty. The only thing that these witnesses are inclined
to complain about was, that the devise to Joseph was not what
they would have made or thought it should be. The theory of the
law is that a testator who is competent and free from restraint,
has a right to dispose of his estate in any way he may deem best,

He is not required to hake an equitable will, and he may, if he chooses, exclude his children, or divide the estate among them unequally. The question in all such cases is: was the will the free act of a competent testator?

Looking to the testimony and evidence offered by the propounders of the will, and the experience that these witnesses had with Mr. Wilson in a business way, and the numerous transactions had with him, covering a long period of time, not only before the making of the will in question, but for some years after its execution, it would seem that the opinions they gave as to the competency of Mr. Wilson are based upon facts and circumstances entitled, in the judgment of this court, to greater weight than the circumstances and facts detailed by the witnesses for the contestant, and without going into detail, the court is of the opinion that, from all the testimony in this case, the verdict of the jury is so clearly unsupported by the weight of the evidence as to indicate some misapprehension or mistake, or bias on the part of the jury or of willful disregard of the law as given by the court in its charge.

We think it comes within the rule that, where the verdict of a jury is manifestly against the weight of the evidence, that it is the duty of a reviewing court to set aside the verdict and grant a new trial.

Upon the issue as to undue influence, we think that the weight of the testimony is against this proposition, and there is not that preponderance of evidence upon either issue that would warrant the jury in returning the verdict they did in this case. Therefore, for these reasons, the judgment in this case will be reversed.

So far as the charge of the court is concerned, and its rulings upon the requests asked by the respective parties, we do no think there was any error committed. Some of the requests that were refused were abstract legal propositions, in the main correct, but there was no special reason why they should be given because they had no application especially to the facts and circumstances of this case; and, therefore, we think that where the court refused to give the special requests there was no error committed.

In the general charge, the court covers substantially the whole of this case, and had the jury applied the facts to the law as given by the court, we think that there necessarily would have been a different verdict returned.   It seems that the verdict is the result either of a misapprehension of the charge of the court as to the law, or bias and prejudice in favor of the contestant, and that they must have caught the spirit that was breathed forth in the testimony of several of the witnesses that they thought the old gentleman was not competent to make a will because he made a will different from what they would have made.

The verdict and judgment of the court rendered in this case are reversed, with costs, and the cause remanded to the common pleas court for further proceedings and trial according to law.